JUDGE DAVID GUADERRAMA   FILED

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS   2023 APR 20  PM 12: 10
EL PASO DIVISION

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

|  |  |
|---|---|
| **ERIK SALAIZ,** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| v. § | |
| § | |
| **THE PNC FINANCIAL SERVICES GROUP,** § | **EP23CV0163** |
| **INC.,** a Pennsylvania Corporation § | |
| § | |
| **Defendant.** § | |
| § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1. The Plaintiff is ERIK SALAIZ ("Plaintiff") a natural person, resident of the Western District of Texas, and was present in Texas for all calls, in this case in El Paso County, Texas.

2. Defendant THE PNC FINANCIAL SERVICES GROUP, INC. ("PNC" "Defendant") is a corporation organized and existing under the laws of Pennsylvania and can be served via its registered agent The PNC Financial Services Group, Inc. at The Tower at PNC Plaza 300 5th Avenue, Pittsburgh, Pennsylvania 15222.

3. Unnamed Party JOHN DOE TELEMARKETER ("John Doe") is an unidentified offshore telemarketing company that makes solicitation phone calls at the instruction, direction, and oversight of Defendant PNC.

### JURISDICTION AND VENUE

4. Jurisdiction. This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow*

1

*Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 302.101 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing calls to Plaintiff; adds little complexity to the case.

5. Personal Jurisdiction. This Court has general personal jurisdiction over the Defendant because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff.

6. Venue. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District. Residing in the Western District of Texas when he received a substantial if not every single call from the Defendant that are the subject matter of this lawsuit.

7. This Court has venue over the Defendant because the calls at issue were sent by or on behalf of the above-named Defendant to the Plaintiff, a Texas resident.

## THE TELEPHONE CONSUMER PROTECTION ACT
## OF 1991, 47 U.S.C. § 227

8. In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

9. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic

telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

10. The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

11. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

12. Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

13. The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

14. According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

15. The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

16. The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

3

written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

17. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

18. The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

19. Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

20. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g., Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal

4

quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## FACTUAL ALLEGATIONS

21. Plaintiff successfully registered his personal cell phone number (XXX) XXX-0898 on the National Do-Not-Call Registry since August 19, 2021, which was more than 31 days prior to receiving the alleged calls.

22. Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

23. Defendant PNC is a bank and offers mortgage loan services to consumers nationwide including Texas.

24. As part of their marketing, Defendant PNC hired and instructed an anonymous offshore telemarketer to make phone calls on behalf of Defendant PNC to tele solicit their mortgage loan services.

25. John Doe unknown entity, that through information and belief, is located offshore and out of the jurisdiction of the United States and the State of Texas.

26. John Doe makes solicitation telephone calls at the direction, instruction, and guidance of Defendant PNC.

27. John Doe employs the use of an automatic telephone dialing system ("ATDS") in furtherance of their telephone marketing campaign on behalf of Defendant PNC.

28. John Doe's ATDS has the capacity to store and produce telephone numbers to be called, using a random or sequential number generator and to dial such numbers.

29. John Doe makes these calls on behalf of Defendant PNC without prior express written consent from the consumers they call.

30. John Doe knowingly and willfully makes solicitation phone calls on behalf of Defendant PNC to consumers that have their residential phone numbers registered on the National Do-Not-Call Registry.

31. Defendant PNC approves of the contracts with John Doe.

32. Defendant PNC authorizes the payments to John Doe.

33. Defendant PNC pays John Doe out of bank accounts Defendant PNC owns and controls.

34. Defendant PNC has been sued multiple times for violating the TCPA and continues their illegal behavior because violating the TCPA benefits Defendant PNC financially.

35. Plaintiff received at least nine (9) unauthorized phone calls within a twelve-month period ("the calls") from John Doe calling on behalf of Defendant PNC soliciting mortgage loan services.

36. The calls were generated using an ATDS that has the capacity to store and produce telephone numbers to be called, using a random or sequential number generator and to dial such numbers.

37. The calls John Doe made to Plaintiff on behalf of Defendant PNC were not made to Plaintiff directly and could have reached anyone in the United States (indicating the call was made using an ATDS).

38. John Doe made at least nine harassing solicitation calls to Plaintiff calling on behalf of Defendant PNC before Plaintiff was able to identify the company John Doe was calling on behalf of.

39. Plaintiff has never been a customer of Defendant PNC, and had no relationship with Defendant PNC, which is an indication of the use of an ATDS.

40. Defendant PNC or John Doe had no reason to have Plaintiff's phone number 0898 in their possession or in any database or spreadsheet that would have been used to call Plaintiff.

41. John Doe spoofed the caller ID numbers they called Plaintiff from including using Plaintiff's area code to trick Plaintiff into thinking the calls were being made local.

42. **Call #1** - On July 19, 2022, Plaintiff received one of multiple calls to his phone ending in 0898 from John Doe calling on behalf of Defendant PNC.

43. Plaintiff was greeted by a telemarketer who falsely identified the company he was calling from and advised Plaintiff he was calling from "US Mortgage."

44. Through information and belief "US Mortgage" is an unregistered fictitious name used by John Doe.

45. Defendant PNC instructs John Doe to say their calling from a fictitious company name such as "US Mortgage" in order to hide Defendant PNC's true identity and duck liability for violating the TCPA.

46. The telemarketer solicited Plaintiff for mortgage loan services on behalf of Defendant PNC.

47. The Plaintiff advised the telemarketer he was not interested and disconnected the call.

48. Despite Plaintiff advising the telemarketer he was not interested, Plaintiff was harassed and bombarded with more calls from telemarketers calling from "US Mortgage" soliciting mortgage loan services.

49. John Doe made at least nine harassing calls to Plaintiff calling on behalf of Defendant PNC before Plaintiff was able to identify the company John Doe was calling on behalf of.

50.     **Call #9** – On August 18, 2022, Plaintiff received a call from John Doe from phone number (831) 335-5706.

51.     Plaintiff was greeted by a telemarketer named Jason who falsely identified the company he was calling from and advised Plaintiff he was calling from "US Mortgage."

52.     The call was not made to Plaintiff directly as Jason did not ask for Plaintiff and the call could have reached anyone in the United States.

53.     Jason was soliciting mortgage loan services and started asking Plaintiff qualifying questions regarding Plaintiff's current mortgage rate and balance.

54.     Plaintiff advised Jason he was interested in a cash out option for the sole purpose of identifying the company responsible for the alleged calls.

55.     Jason then collected Plaintiff's name and address and then stated to Plaintiff,

"let me just fill out the form for you sir so I can just bring my loan officer on the very same line so he can go over the rates that we can offer you today alright?"

56.     Plaintiff was then transferred to a loan officer from Defendant PNC named Josh Moore.

57.     Before Plaintiff was transferred to Josh, Plaintiff heard a conversation between Jason and Josh:

Josh: "Hello this is Josh how may I help you?"
Jason: "Hi Josh I got Mr. Salaiz on the line.
Josh: Let me check that form. I don't have the form you guys aren't posting the form and for some reason I'm not getting it on my computer.
Jason: I don't know what the issue is with that sir but right now let me just fill out the form again for you.
Josh: What message do you see once you submit the information?
Jason: I don't see a message I just see that the form has been submitted.

58.     Jason then provided Josh with Plaintiff's name and mortgage information to enter into Defendant PNC's system manually since they were having system issues.

59.     Acting as an agent on behalf of Defendant PNC, John Doe shares a software system that

8

is designed for John Doe to transfer new customer leads directly to Defendant PNC.

60. Josh accepted the call from Jason which confirmed Defendant PNC hired John Doe to generate new customer leads and procure more business for Defendant PNC.

61. Josh introduced himself to Plaintiff and stated he is a loan officer with Defendant PNC which revealed the company responsible for the calls.

62. Josh asked Plaintiff qualifying questions regarding his mortgage, employment, credit score, income and solicited Plaintiff for a cash out option on behalf of Defendant PNC.

63. Josh then stated to Plaintiff, which again confirmed the relationship between Defendant PNC and John Doe,

"Can you please confirm me your property address because my associate for some reason they are unable to send the information on my computer so can you please just give me some basic information like your name, phone number, and the property information?"

64. With information and belief Defendant PNC relies on John Doe to make telemarketing calls on its behalf, Defendant PNC has direct knowledge that such calls are being made to residential numbers (including cell phones) that are registered on the National Do Not Call Registry without prior express written consent.

65. With information and belief Defendant PNC relies on John Doe to make telemarketing calls on its behalf, Defendant PNC hired them to interact with the public on Defendant PNC's behalf and therefore gave implied authority to represent Defendant PNC and call residential numbers (including cell phones) that are registered on the National Do Not Call Registry without prior express written consent.

66. Defendant PNC ratifies the behavior from John Doe by knowing of the illegal conduct and failing to repudiate the conduct.

67. Plaintiff did not provide his prior express written consent to receive any of the alleged

calls.

68. None of the alleged calls were made for emergency purposes.

69. Plaintiff made at least three do not call requests ("DNC") to John Doe.

70. Table below displays the calls made to Plaintiff on behalf of Defendant PNC.

TABLE A

| Number: | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| 1. | 07/19/2022 | 4:32 PM | 915-432-8752 | Telemarketer calling from John Doe soliciting mortgage loan services. Told them I wasn't interested and disconnected the call. **DNC Request #1** |
| 2. | 07/22/2022 | 4:32 PM | 915-478-9315 | Telemarketer calling from John Doe soliciting mortgage loan services. Call dropped. |
| 3 | 07/25/2022 | 2:04 PM | 915-445-7935 | Telemarketer calling from John Doe soliciting mortgage loan services. Call dropped. |
| 4 | 07/28/2022 | 3:29 PM | 915-444-4161 | Telemarketer calling from John Doe soliciting mortgage loan services. Told them I wasn't interested and disconnected the call. **DNC Request #2** |
| 5 | 08/05/2022 | 11:04 PM | 915-447-6731 | Telemarketer calling from John Doe soliciting mortgage loan services. Told them I wasn't interested and disconnected the call. **DNC Request #3** |
| 6 | 08/10/2022 | 5:04 PM | 831-335-5710 | Telemarketer calling from John Doe soliciting mortgage loan services. Call dropped. |

| 7 | 08/17/2022 | 10:39 AM | 830-637-2168 | Telemarketer calling from John Doe soliciting mortgage loan services. Call dropped. |
| 8 | 08/17/2022 | 12:14 PM | 915-491-2216 | Telemarketer calling from John Doe soliciting mortgage loan services. Call dropped. |
| 9 | 08/18/2022 | 12:42 PM | 831-335-5706 | Telemarketer calling from John Doe soliciting mortgage loan services. Transferred to loan officer Josh Moore with PNC. |

71. John Doe initiated numerous unsolicited telephone calls, made unlawful telemarketing sales pitches to Plaintiff regarding mortgage loan services on behalf of Defendant PNC.

72. Defendant PNC employs, contracts, or authorizes John Doe to make phone calls on their behalf.

73. John Doe uses various spoofed caller IDs and knowingly and willfully ignore Do Not Call lists in the marketing of services on behalf of Defendant PNC.

74. Defendant PNC has knowledge of and has adopted and maintained TCPA violations as a sales strategy.

75. Defendant PNC knew full well that John Doe is calling and harassing consumers in an attempt to procure business on behalf of the Defendant PNC.

76. Defendant PNC willfully accept these referrals and compensate John Doe for their illegal phone calls.

77. Each and every call was placed while knowingly ignoring the national do-not-call registry.

78. On information and belief, Defendant PNC did not train John Doe who engaged in telemarketing on the existence and use of any do-not-call list from Defendant PNC.

79. Upon information and belief, John Doe did not have a written do-not-call policy from Defendant PNC while it was sending Plaintiff the calls.

80. Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3)(requiring telemarketers to honor and record DNC requests when made).

81. Plaintiff has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity.

## VICARIOUS LIABILITY OF DEFENDANT PNC

82. Defendant PNC is vicariously liable for the telemarketing calls that generated the lead on their behalf.

83. The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

84. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

85. The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

86. The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave

> consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration marks and internal quotation marks omitted).

87. More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

88. The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

89. To the contrary, the FCC—armed with extensive data about robocalls and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

90. Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

91. Defendant PNC is legally responsible for ensuring that John Doe that makes telemarketing calls on their behalf comply with the TCPA when so doing.

92. Defendant PNC knowingly and actively accepted business that originated through illegal telemarketing.

93. Defendant PNC knew (or reasonably should have known) that John Doe was violating the TCPA on their behalf but failed to take effective steps within their power to force them to cease that conduct.

94. By hiring a company to make calls on its behalf, Defendant PNC "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

95. Moreover, Defendant PNC maintained interim control over the actions of John Doe.

96. For example, Defendant PNC had absolute control over whether, and under what circumstances, they would accept a customer from John Doe.

97. Furthermore, Defendant PNC had day-to-day control over the actions of John Doe, including the ability to prohibit them from using an ATDS to contact potential customers of Defendant PNC and the ability to require them to respect the National Do Not Call Registry.

98. Defendant PNC also gave interim instructions to John Doe by providing lead-qualifying instructions and lead volume limits.

99. Defendant PNC donned John Doe with apparent authority to make the calls at issue. Thus, John Doe pitched mortgage loan services in the abstract.

100. Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

101. "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

102. A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

103. John Doe transferred customer information, including Plaintiff's contact information, directly to Defendant PNC. Thus, John Doe had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

104. Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

105. Defendants PNC is the liable party as the direct beneficiary of the illegal telemarketing calls as they stood to gain Plaintiff as a customer.

## **INJURY, HARM, DAMAGES, and ACTUAL DAMAGES**
## **AS A RESULT OF THE CALLS**

95. The calls harmed the Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

96. The calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

97. The calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

98. Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of his cell phone.

## THE PLAINTIFF'S CELL PHONE IS A RESIDENTIAL NUMBER

99. The calls were to Plaintiff's cellular phone 0898 which is Plaintiff's personal cell phone that he uses for personal, family, and household use. Plaintiff maintains no landline phones at his residence and has not done so for at least 15 years and primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

## Violations of the Texas Business and Commerce Code 305.053

100. The actions of the Defendant violated the Texas Business and Commerce Code 305.053 by placing automated calls to a cell phone which violates 47 USC 227(b). The calls on behalf of the Defendant violated Texas law by placing calls using an ATDS to a cell phone which violates 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

101. The calls by the Defendants violated Texas law by spoofing the caller ID's per 47 USC 227(e) which in turn violates the Texas statute.

## CAUSES OF ACTION:

## COUNT ONE:

### Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing Without Prior Express Written Consent

102. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

103. Defendant and/or their telemarketer or agents violated the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), at least nine (9) times by placing non-emergency telemarketing calls to Plaintiff's cellular telephone number using an automatic telephone dialing system without prior express written consent.

104. Plaintiff was statutorily damaged at least nine (9) times under 47 U.S.C. § 227(b)(3)(B) by the Defendant by the telephone calls described above, in the amount of $500.00 per call.

105. Plaintiff was further statutorily damaged because Defendant willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court triple the damage amount to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing violation.

106. Plaintiff is also entitled to and does seek an injunction prohibiting Defendant and their

affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-emergency telemarketing calls

## COUNT TWO:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 C.F.R. § 64.1200(C))

107. Mr. Salaiz realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

108. Defendant and/or their telemarketer or agents called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

109. Plaintiff was statutorily damaged at least nine (9) times under 47 U.S.C. § 227(c)(3)(F) by the Defendant by the telephone calls described above, in the amount of $500 per call.

110. Plaintiff was further statutorily damaged because Defendant willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under 47 U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

111. Plaintiff is entitled to an award of up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT THREE:

### Violations of The Texas Business and Commerce Code 305.053

112. Mr. Salaiz realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

113. The foregoing acts and omissions of the Defendant and/or their affiliates or agents constitute multiple violations of the **Texas Business and Commerce Code 305.053**, by

making non-emergency telemarketing calls to Mr. Salaiz's cellular telephone number without his prior express written consent in violation of 47 USC 227 et seq. Defendant violated 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e) by using an ATDS that does not comply with the technical and procedural standards under this subsection.

114. Mr. Salaiz is entitled to an award of at least $500 in damages for each such violation.

**Texas Business and Commerce Code 305.053(b)**

115. Mr. Salaiz is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. **Texas Business and Commerce Code 305.053**(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Erik Salaiz prays for judgment against the Defendant jointly and severally as follows:

A. Leave to amend this Complaint to name additional DOES as they are identified and to conform to the evidence presented at trial;

B. A declaration that actions complained of herein by Defendant violates the TCPA and Texas state law;

C. An injunction enjoining Defendant and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D. An award of $1500 per call in statutory damages arising from the TCPA §227(b) intentional violations jointly and severally against the corporation for nine (9) calls.

E. An award of $1500 per call in statutory damages arising from the TCPA §227(c) intentional violations jointly and severally against the corporation for nine (9) calls.

F.       An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053 intentional violations jointly and severally against the corporation for nine (9) calls.

G.      An award to Mr. Salaiz of damages, as allowed by law under the TCPA and Texas state law;

H.      An award to Mr. Salaiz of interest, costs, and attorneys' fees, as allowed by law and equity.

I.       Such further relief as the Court deems necessary, just, and proper.

April 20, 2023,               Respectfully submitted,

Erik Salaiz
Plaintiff, Pro Se
319 Valley Fair Way
El Paso, Texas 79907
915-490-0898
Salaiz.ep@gmail.com